The next case we'll call is Ren v. USCIS. And I guess, Mr. Forney, you're up first and you're by remote. And we have Ms. McKenzie here in person. She will argue the other side. And you can see him, can't you? Okay. All right. Okay. We'll hear from you, Mr. Forney. Thank you, Mayor. Please, the court. USCIS's denial of Eliza's multinational manager or executive petition was arbitrary and capricious because the agency's decision ignored detailed evidence in the record regarding Ren's duties and achievements, showing his directing the companies through discretionary decision making. The agency failed to consider, contrary to the statute, evidence regarding the operational needs of Eliza in light of the stage of the company's development. And additionally, the agency applied a faulty legal premise that executive duties must be defined by specifying the executive's daily routine. Each error standing alone requires that the agency's decision be set aside for failure to engage in reasoned decision making. The Supreme Court recently reaffirmed in Prometheus Radio Project, the principle that an agency's decision must be substantively reasonable and reasonably explained. And those requirements, basic under the APA, include addressing the evidence in the record and issuing a decision in light of the information before the agency. The agency here failed to meet those requirements because it ignored facts in the record, and it applied an improper legal standard, which resulted in its failing to consider relevant factors. Mr. Forney, can I ask you about the record, about the facts here? I'm looking at page 41 of the joint appendix, and that is an organization chart. As I understand it, an executive is supposed to be overseeing other professionals who might be overseeing persons. It's sort of a... Oh, excuse me, 73. It's 41 on another number. Thank you. Yes. So, well, the organizational chart is relevant. Let me ask a question about the chart. Is that the management chart? Is that show all the management? As of 2018, that chart was current, yes. And what does it show? It's intended to show the different management positions? Yes. Of course, in schematic form, more relevant, of course, is the company's detailed support letter, which... Well, I'm asking about the chart. I'm trying to ask what the chart shows. Because the chart, if you exclude the independent contractors, the chart has, I think, 10 persons who are on the management hierarchy. It's not what it is. On the left, you have to exclude that that's a contractor. And on the right, the three you have to exclude. At the bottom are the persons, the representatives who are authorized to sell your product. But in the center, the employees are... There's 10 of them there. And are all those 10 purported to be management? No. At that time, the company, Eliza... That's a relevant time here. This is the relevant time, the first quarter of 2018, right? Correct. All right. So, at that time, this shows 10 management employees, right? No, I don't believe so. The company had... How many persons on that chart are management? I mean, at that time, the company had nine full-time employees. So, we're excluding contractors... I'm asking a specific question. On that chart, how many of those boxes are management? The top row below the administrative assistant. All right. So, the administrative assistant is not management, right? That's correct. So, the top row is two people. Okay. I'm looking at Joint Appendix 73, and the row just below the administrative assistant has one, two, three, four, five... Well, the one on the left is a contractor, and I think there was just one... Dr. Cox did one thing, one discrete thing as a contractor. On the right is the same issue. One is the accountant, and one is the lawyer that was hired for some discrete business. Right. The only persons that are employees of the company on that line are the two middle ones, Kaifong Huang, and that person happens to be his wife, right? Well, that I'm not sure of. I'm sorry. Well, I'm sure of it. He's revealed that. And the other person is John... John Redding. John Redding is the one that wrote all these documents describing how big the position is of REN, putting all the language that you say the agency ignored. For the Eliza document. I'm just having trouble looking at this in any critical fashion, understanding why Mr. REN would fit the definition of an executive as defined by... The executive position is defined at a pretty high level. That's right. And so this is what the agency's looking at. And then on the next page of the joint appendix, there are the 10 employees listed at the top there. And it looks like even of the 10, one's his wife and one's part-time, at least one, maybe more are part-time. The question is, aren't we... When you say he's an executive, it's quite an embellishment of this organization, which looks like it has his wife and one other professional functioning as a supervisor. Well, even still, he still meets the definition of executive. The definition is executive capacity is that the person primarily directs the management of the organization or a major component or function of the organization, establishes the goals and policies of the organization, exercises wide latitude and discretionary decision-making, and receives only general supervision or direction from higher-level executives or a board of directors. He meets every single one of those according to the facts in the record, at least as far as Eliza is concerned. And you mentioned that John Redding, who is critical in this because he is the... As the COO, is the one who is executing Wren's discretionary decision-making. So Wren was acting through a higher-level manager in refashioning and directing the organization. But, you know, Wren wasn't the only individual who provided evidence in this record. It was also, of course, the... Mr. Zhu from the parent company in China, Triple R, provided evidence as well. If I could ask you a question, it's my understanding in order for both for the prior employer, Triple R, and for Eliza. So even if we were to agree with you on Eliza, you would still have to meet the criteria of the prior company. Is that correct? Oh, that's right. The qualifying beneficiary must have been performing in a managerial or about Eliza. And, you know, reading the definition in light of the facts in the record, that is established. Mr. Wren was functioning in executive capacity. But that's the case as well for Triple R, which was a little bit of a larger organization. But Mr. Wren functioned there at a very high level as the general manager, revising and refashioning the production processes through upper-level management at that organization, putting in place new management procedures and new production processes at its factory. The agency, if I'm remembering the record correctly, indicated that there was more documentation with regard to Eliza than there was with Triple R. So that the two seemed to have the same level of proof admitted in the agency proceeding. And that the agency determined that the Triple R proof was insufficient and what was sent after that wasn't very specific. Well, the agency's decision had two parts. It took issue with the evidence from Triple R and as well from Eliza. But, of course, we think that there was the same legal error on both counts, ignoring relevant evidence, cherry-picking facts, and ignoring the detailed recitations from the relevant witnesses about how Wren was functioning at a higher level and engaging in discretionary decision-making. Of course, this court's been clear in an administrative law context that it's inappropriate for an agency to cherry-pick from the evidence and then ignore or fail to explain why contrary or seemingly inconsistent evidence with what the agency cherry-picked was outweighed. And that's the court to reweigh the evidence. That's false. It's not about reweighing the evidence. The agency didn't weigh the evidence in the first instance because it ignored critical facts in the record and applied an inappropriate legal standard. Hence, that resulted in an erroneous conclusion. Failing to weigh that evidence in the first instance is the fundamental flaw in reasoning with the agency. One of the critical legal errors that led to the agency ignoring evidence was the fact that it applied an inappropriate standard not appearing in the statute to define executive to require a recitation by the company of the daily routine of the executive officer. That goes against the plain meaning of the statute. But, counsel, if I could just interrupt you. I mean, certainly, the agency asked in order to determine whether the petitioner, whether the employee was of a managerial executive level for day-to-day information. But it seemed to me they were asking for day-to-day information in order to consider the statutory and regulatory standard. It seems a stretch to say because they saw certain evidence that they thought would be relevant to that, they've changed the standard. It looks to me like they're just looking for information in order to determine the details beyond some of the general labels of the work that was described. Well, the agency asked for percentages which the RRR and Eliza presented. The numerical percentage of breakdown of his tasks in general. And then each company then provided details and achievements that Ren had effectuated at each of those companies to show how he had executed his discretionary decision-making. The problem was that the agency went even further and then faulted the petitioner and the parent company for not providing what the agency said on routine and an actual breakdown of the day-to-day job duties. The problem with that is if you're asking a company to say what its executive does day-to-day in terms of percentages in the person's daily routine, you're starting to treat that person as a line-level production person or maybe a middle-level supervisor whose day is predictable you know, based on past events. But an executive's job is not predictable. And as recognized in the statute, it's someone who engages in discretionary decision-making at the highest levels and effectuates those decisions through staff who maybe has a daily routine. Yeah. I'm sorry to cut you off because you're answering my question. But you're right. And I've read the briefs and I think I appreciate that. So, I don't want you to think I'm ignoring what you're saying. But I have an issue that wasn't briefed and it's this. You sued in federal court. I say you, I don't know if it's you. A lawsuit was commenced in federal court without appealing to the appeals office that applied to this type of decision. Is there a problem with that? I kind of hesitate with all the exhaustion talk we've had in this meeting today to raise that again. But do we have an issue here on exhaustion? Yes. I mean, I had the pleasure of listening to the prior argument which was, I think, under the Social Security Act. So, of course, the statute is very different. What we have here is an APA claim. And of course, as established by the Supreme Court in Darby v. Cisneros 509 U.S. 137 at 146 to 47 in 1993, it's pretty well established that exhaustion is only required if the statute or the regulation requires it. And there's a procedure by which, of course, the agency's decision is suspended during the time of the administrative appeal. No statute or regulation in the context of this petition process requires an administrative exhaustion to the administrative appeals office. Hence, under the Supreme Court's jurisprudence, that type of administrative appeal wasn't required before going to federal court. There was already a final agency action for the district court to review. I guess I'm out of time. Thank you. Thank you, Mr. Forney. All right, Ms. McKenzie. Good afternoon, Your Honor. May it please the court. My name is Ana McKenzie. I'm an assistant U.S. attorney in the Eastern District of Virginia, and I represent the United States Citizenship and Immigration Services. Did the microphone just pull it up there a little bit? Okay. Is that better, Your Honor? Yeah. I represent the United States Citizenship and Immigration Services in this case. Applying the APA's deferential, arbitrary, and capricious standard of review, the court should uphold the agency's decision denying Eliza's I-140 petition for an EB1C visa for Mr. Wren. As Judge Agee aptly observed, to establish Mr. Wren's eligibility for a multinational manager or executive immigrant visa, Eliza not only had to prove that Mr. Wren would act primarily in a managerial or executive capacity for Eliza, it also had to prove that Mr. Wren, one of the three years prior to his entry into the United States, functioned primarily in an executive or managerial capacity for RRR, Eliza's Chinese parent company. The agency considered Eliza's evidence and reasonably concluded that Eliza failed to satisfy its burden to establish either of these requirements, and each failure provides an independent basis for affirming the agency's decision. The agency adequately explained how it reached its conclusions, and its decision to deny the visa was not arbitrary or capricious. As this court instructed in Hawley-Hill, under the APA's arbitrary and capricious standard, the court may set aside an agency's decision only if the agency failed to conform with controlling statutes or committed a clear error of judgment. The scope of review is narrow. The court is not as the district court correctly held. There is a rational basis for the agency's decision, and so the decision must stand. First, with respect to Mr. Wren's role at RRR, the agency reasonably concluded, based on the record evidence, that Eliza had not presented evidence with sufficient specificity to enable the agency to determine that Mr. Wren acted in a primarily executive or managerial capacity. In response to the agency's request for that specific information, Eliza submitted a letter from RRR's Deputy General Manager, Mr. Xu. Mr. Xu's letter uses a lot of corporate buzzwords. It references generic concepts and terms, many of which borrow language directly from the INA's definitions of managerial and executive capacity. Ultimately, though, the letter sheds very little light on what exactly Mr. Wren did during his nearly six years at RRR. The specifics that are offered are limited. For example, the letter discusses Mr. Wren's involvement in introducing ergonomic workbenches and a couple of safety measures, including the provision of safety goggles for workers, but there's no indication of when these developments occurred, what Mr. Wren did to implement them, or how much time he spent on them, or even where those projects fit within the broad categories of duties for which percentage breakdowns were provided. The generic way Eliza's evidence described Mr. Wren's role at RRR is similar to the vague job descriptions that have led courts across the country to uniformly uphold the agency's denial of I-140 petitions for multinational manager and executive immigrant visas. Given Eliza's failure to address how, where, when, and with whom Mr. Wren performed his duties at RRR, the agency's denial of Eliza's I-140 petition cannot be construed as a clear error of judgment. The agency's decision may be upheld on this basis alone. The agency found similar infirmities with respect to Eliza's evidence regarding Mr. Wren's role at Eliza, but the agency's bigger problem with that evidence was that Eliza failed to establish that Mr. Wren would be primarily performing managerial or executive duties as opposed to performing non-qualifying operational activities of the business. An intended beneficiary does not qualify for manager or executive visas simply because he performs some managerial or executive duties. Such tasks must encompass his primary responsibilities. Workers whose jobs involve a mix of management and non-management responsibilities do not meet the statutory requirement. Eliza's evidence revealed that Mr. Wren's duties at Eliza included non-managerial and non-executive operational activities such as conducting sales and marketing activities and implementing training programs. And additionally, Eliza employed only 10 employees and had not reached the level of organizational complexity to permit managerial and executive duties to comprise the primary portion of Mr. Wren's duties here in the United States. And because Eliza provided an insufficiently detailed breakdown of Mr. Wren's duties at Eliza, the agency couldn't discern what percentage of Mr. Wren's time he spent on these non-managerial, non-executive duties. As a result, it reasonably concluded that Eliza failed to meet his burden of establishing that Mr. Wren would primarily act in a managerial or executive capacity at Eliza, as the statute requires. Council, could I kind of interrupt you? I kind of finished asking your colleague a question about what they have done and not done in response to the decisions regarding the petition. And I think that I may be mistaken and very interested in your views that there's a regulation, HCFR Section 204.5, that says the denial of a petition for classification shall be appealable to the associate commissioner for examinations. And that wasn't done. Now, the language says shall be appealable. It doesn't say shall be appealed. And that may make it on the failure to take advantage of that appeal opportunity to the Administrative Appeals Office. Yes, Your Honor. The government's position that there was no requirement to appeal to administratively exhaust. I believe there's one district court opinion going the other way, but the language that you pointed to, the appealable language is considered to be non-mandatory. However, the government did, in a footnote in its district court briefing, indicate that there is an issue of issue exhaustion here that Mr. Renk and Eliza could have presented these arguments through an appeal, as you note, and therefore forfeited its ability to raise those issues at the court, that that issue was not considered in the written decision by the district court. And you didn't raise that before us either, did you? We did not. And you don't think it's jurisdictional? That's correct, Your Honor. Okay. All right. Thank you. The deficiencies, the evidentiary deficiencies in this case are quite similar and have many to uphold USCIS's denial of an EB-1C visa for the CEO of an American subsidiary of an Israeli company in Decor Team, McAleenan, in 2021. Just like in this case, in Decor Team, the agency issued an RFE to the petitioner requesting additional details about the beneficiary's role, and the plaintiffs did provide additional materials, including a business plan describing the duties of the beneficiary's subordinates, an organization chart, and letters describing the beneficiary's job duties and breaking them down into five primary duties, 14 secondary duties, and 27 tertiary duties. And the court there concluded that there was a rational basis in the record for the agency determining that Decor Team had not demonstrated the role was primarily managerial or executive because the evidence submitted lacked detail about the beneficiary's day-to-day activities, and the descriptions did not specify which tasks were executive or managerial. You know, this case presented an interesting question for me when I was reading it. If I formed a little business in my garage, and I formed a business, my wife helped me out, and I hired one assistant who does other tasks with respect to my little three-person business, and I say I made the determinations about policy, design, I supervised the others, they carried out my plans, and so forth, the question is, why am I not an executive under the definition? I mean, it seems to be, I agree with the agency in this case that there was just a lot of fluff in the description of what Mr. Wren did. The fact is, he set policy, did this, and did this, and they wanted more details to know day-to-day, am I supervising another person, a professional, somebody, and not just first-line supervision. It seems to me that's totally legitimate, but the line to draw there is sort of crazy. Why isn't my three-person, why am I not an executive of my little three-person business? The hypothetical you raised, Your Honor, is similar to the facts presented to the Ninth Circuit in Brazil Quality Stone. In that case, it was a relatively small business, and there's another Ninth Circuit precedent as well, Family Inc., that was a mom-and-pop shop like that you're describing. The key in those cases, which held that the company's small size may be considered as a factor in determining whether an agent, whether a beneficiary will be acting in a primarily managerial or executive capacity, the key is that it can't be, that can't be the only factor that's considered. It can't be a reflexive decision by the agency, you only have three employees, therefore you're not large enough, but the agency can consider that as one factor, and what matters is the language of the statute, which says that the beneficiary's role must be primarily performing the enumerated tasks within the executive and managerial definition, and so when you have these mom-and-pop shops, often they are performing some executive and managerial tasks, but they are also performing the operations of the business, they're making deliveries. So counsel, isn't it the case, I mean Judge Niemeyer, we talked about similar situations, that the regulations in effect do maybe put a small business at a disadvantage, but we're not talking about, you know, but what we're talking about here is in the context of an immigration policy with a benefit that's permanent in nature, and the executive has the ability to limit that type of benefit, and they may have drawn a line that may make it more difficult for small businesses because they really are limiting this to a specific category of employee. May seem a little unfair, I kind of have the same thought, but given, I think we have to keep in context of an agency's decision related to a permanent issue related to immigration matters and national security matters. Yes, your honor, that's exactly right. Just to carry on on that, it looks like the program is intended to promote the exchange of multinational executives, so as to improve, to take the benefit, let people in the country who are executives of an American company, where they have managerial roles and supervision and what we typically think of as an executive, it's just that I think in coming down to definitions and making distinctions, it gets a little harder. Yes, your honor. Okay, anything else? In summary, given Eliza's failure to meet its burden of establishing both, Mr. Wren had functioned in primarily an executive or managerial capacity at RRR and would function primarily in a managerial or executive capacity at Eliza, the agency's decision to deny the petition is supported by a rational basis and was not a clear error of judgment. The court should affirm. Thank you. Mr. Forney? You're muted. Can you hear me? I can, thank you. My mistake. My apologies. Yes, just briefly, to address, to close the loop, as they say on this exhaustion issue, I think the government's correct in their position is correct that there is no statutory regulatory requirement and I only bring this up to, of course, advise the court of more relevant authority on that point. The administrative appeal process in the general context of benefits adjudication is addressed in more detail in 8 CFR 103.3 and I kindly direct the court's attention to that regulatory scheme, which I think will resolve any doubt about the issue that there is no requirement in this context to effectuate administrative appeal to the AO before to district court under the APA. Just two other points, and I think it bears mentioning that it is true that the staffing levels may be considered by the agency, but Congress has been pretty clear on how they do that. The statute does discuss staffing levels and what the agency is supposed to do if they consider staffing a relevant factor. And, you know, it's in the 1001, excuse me, 1001A44C, which mentions that if staffing levels are used as a factor, the government must take into account the reasonable needs of the organization and its overall purpose at the stage of its development. And that language is critical because the government essentially failed to do that in this case. The ELISR presented a very detailed business plan, which discussed not only historically what it had done up to that point in time, but also its intentions going forward. And on a critical point, Joint Appendix 185, there was a discussion about how Mr. Wren decided to refashion the business approach of the company, close down a division, and refocus its efforts on a wholesale line and effectuate a more consistent import-export relation with the parent company. And those efforts are detailed in that business report, including the hiring of John Redding as a full-time COO to effectuate this new transition, and the hiring of new staff to engage in warehousing operations. None of that was mentioned in the agency's decision. Where's Mr. Wren right now? Mr. Wren, his L1A status has expired. So, of course, in compliance with immigration law, he's back in China, you know, overseeing, helping oversee operations at RRR and continuing the ELISR, which is still a going concern in Virginia. Okay. Any more? There's no other questions from the court. I think, having directed the court to the relevant parts of the record, it's clear that the government failed in its duty to engage with the relevant facts, cherry-picked facts from the record and ignored facts that went against its conclusion. Therefore, it failed to engage in its duty of effectuating a reasoned decision-making process. On that basis, this court should remand this matter back to the district court with instructions to set aside the agency's decision. Thank you. Thank you. All right. We'll take that under advisement. Thank you both for your arguments. We're not going to come down and shake your hand this time. I hope, Mr. Forney, you're feeling better. Thanks so much. And I appreciate the court's accommodation. I do apologize for any inconvenience. I just didn't want to infect anyone. All right. We'll stand adjourned for today.
judges: Paul V. Niemeyer, G. Steven Agee, A. Marvin Quattlebaum Jr.